**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**


LORI A. MULLINS,
     *Plaintiff*,                 CASE NO. 2:14-CV-13288-PTM

*v*.

COMMISSIONER OF              MAGISTRATE JUDGE PATRICIA T. MORRIS
SOCIAL SECURITY,
     *Defendant*.

_____/


**OPINION AND ORDER[1]**

## I.    INTRODUCTION

This is an action for judicial review of Defendant's decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits. The case is before this magistrate judge pursuant to the parties' consent under 28 U.S.C. § 636(c) and District Judge Gerald E. Rosen's order of reference. (Doc. 15.) Pursuant to E.D. Mich. LR 7.1(e)(2), Plaintiff's Motion for Sentence Four Remand (Doc. 13) and Defendant's Response and Motion for Summary Judgment (Docs. 17) will be decided without oral argument. The Court has also reviewed Plaintiff's response to Defendant's motion. (Doc. 18.)

## II.    ANALYSIS

### A.    Background

---

[1] The format and style of this Opinion and Order are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Order only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Plaintiff Lori Mullins was forty-two years old at the time of the administrative hearing on September January 28, 2013. (Transcript, Doc. 10 at 25, 151.) Plaintiff worked as an assistant manager at a car dealership, a collections account representative, a cashier, a customer service representative, and in home health care before her alleged disability onset date. (Tr. at 202.) Plaintiff filed her claims for DIB and SSI on January 27, 2012, alleging that she became unable to work on December 22, 2011. (Tr. at 151, 166.) The claims were denied at the initial administrative stage. (Tr. at 97, 98.) In denying Plaintiff's claims, the Commissioner considered affective disorders and anxiety-related disorders. (*Id.*) On March 22, 2013, Plaintiff appeared before Administrative Law Judge ("ALJ") Dawn M. Gruenburg, who considered the application for benefits de novo. (Tr. at 25-72.) In a decision dated May 16, 2013, the ALJ found that Plaintiff was not disabled. (Tr. at 6-24.)

On June 27, 2014, the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On August 25, 2014, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

### B.    Standard of Review

The Social Security Administration has promulgated the following rules for the administration of disability benefits. *See* 20 C.F.R. §§ 401-422. First, a state agency, acting under the authority and supervision of the Administration, usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If denied, the claimant may seek review of the state's decision through the Administration's three-stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered de novo by the state agency. *Id.*

2

Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after the Commissioner has issued a final administrative decision that is unfavorable may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review where we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

**C.     The ALJ's Five-Step Sequential Analysis**

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). While, in general, the claimant "is responsible for providing the evidence" to make a residual functional capacity ("RFC") assessment, before a determination of not disabled is made, the Commissioner is "responsible for developing [a claimant's] complete medical history, including arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1545(a)(3).

Title II, 42 U.S.C. §§ 401-434, provides DIB to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI, 42 U.S.C. §§ 1381-1385, provides Supplemental Security Income ("SSI") to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). "DIB and SSI

are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730

(6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last for
> a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Disability is to be

determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful
> activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . . physical or mental
> ability to do basic work activities," benefits are denied without further
> analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity,
> has a severe impairment that is expected to last for at least twelve months,
> and the severe impairment meets or equals one of the impairments listed in
> the regulations, the claimant is conclusively presumed to be disabled
> regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant
> work, if other work exists in the national economy that plaintiff can
> perform, in view of his or her age, education, and work experience, benefits
> are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v.Comm'r of Soc. Sec.*, 245 F.3d 528, 534

(6th Cir. 2001). "If the Commissioner makes a dispositive finding at any point in the five-step

process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity

of limitations caused by" an impairment that precludes performance of past relevant work.

*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (cited with approval in *Cruse*

4

*v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)). If the analysis reaches step five, the burden shifts to the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(a)(4)(g)); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

### D.   The ALJ's Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at Step One that Plaintiff met the insured status requirements through December 31, 2016, and had not engaged in substantial gainful activity since December 22, 2011, the alleged onset date. (Tr. at 11.) At Step Two, she found that Plaintiff's conditions of major depression, bipolar disorder, and panic disorder were "severe" within the meaning of 20 C.F.R. § 404.1520 and § 416.920. (*Id.*) At Step Three, she found that Plaintiff did not have an impairment or combination of impairments that met or was the medical equivalent of a listing in the regulations. (Tr. at 13-14.) At Step Four, she found that Plaintiff could perform unskilled light work with several limitations and was unable to perform any past relevant work. (Tr. at 15.) She also found that Plaintiff was forty-one years old on the alleged onset date, putting her into the "younger individual" range of eighteen to forty-nine years old. (Tr. at 18.) At Step Five the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, there were jobs existing in the economy in significant numbers that Plaintiff could perform, and therefore Plaintiff was not disabled. (Tr. at 18-19.)

### E.   Administrative Record

### 1.   Medical History

5

In 1975, when Plaintiff was five years old, she received a psychological evaluation from Dr. La Verne La Driere. (Tr. at 283-85.) The test results indicated she was "normally adjusted youngster of average intellectual ability with no obvious defects in functioning. Personality assets include[d] an outgoing disposition, ease in intrapersonal relationships and good reality contact. Her liabilities [were] primarily in her relationship to and intense identification with her mother and the anxieties this generate[d] for her." (*Id.*)

Plaintiff was hospitalized in December 2005 for psychiatric treatment. (Tr. at 297.) Plaintiff began outpatient treatment at Michigan Psychiatric and Behavioral Associates on January 2, 2007 because she was having suicidal thoughts. (Tr. at 292.) Plaintiff saw Dr. Douglas L. Foster on January 3. (Tr. at 286-87.) She said that she had suicide plans of running a car into a wall or overdosing on pills. (*Id.*) Plaintiff had been a victim of physical abuse from boyfriends and husbands, was molested as a young child, and was raped at age fifteen. (Tr. at 286-87, 290.) She also had lost her infant son to Sudden Infant Death Syndrome ("SIDS") in December 1992. (Tr. at 286-87.) Dr. Foster noted that she had spontaneous thoughts of suicide, which seemed to manifest most often in the month of December. (*Id.*) Dr. Foster gave Plaintiff a Global Assessment of Functioning ("GAF") score of 40.[2] (Tr. at 288.) His impression was major depression and he started Plaintiff on Celexa. (Tr. at 287.) He found her major stressors were unresolved abuse and anger issues and low self-esteem. (Tr. at 288.) He also recommended she seek treatment for substance abuse. (*Id.*) On April 11 Plaintiff's GAF score

---

[2] According to the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders, a GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) [hereinafter *DSM-IV*]. The fifth edition of the DSM, however, rejects the use of GAF scores altogether. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed., 2013).

was 68.[3] (Tr. at 292.) Plaintiff was discharged from outpatient treatment on June 26, 2007, after making "significant progress in decreasing her depression," because she was not complying with her medications and stopped attending her appointments. (Tr. at 291-92.)

On May 31, 2008, Plaintiff overdosed on medications and had snorted cocaine. (Tr. at 289.) Dr. Mukesh Lathia started her on Zoloft and recommended that she transfer to the Mental Health Unit of Michigan Psychiatric and Behavioral Associates. (*Id.*) Plaintiff went against this recommendation and was discharged on June 10. (Tr. at 289, 300.) On August 20 Plaintiff reported hypomanic symptoms—she would be "extremely happy, talk a lot, would be giddy, goofy, would spend a lot of money, would go through significant cleaning sprees, and would also have increased sexual desire." (*Id.*) She was started on Lamical, which was discontinued because she developed hives. (*Id.*) Also on August 20, Plaintiff was placed on Depakote, which was replaced with Trileptal on August 28 because she felt like a "zombie" and she "was crying all the time." (*Id.*)

Plaintiff saw Dr. Lathia on October 30, 2008. (Tr. at 289-91.) Plaintiff was living with her mother and working as an office manager at this time. (*Id.*) She had two living children: an eight-year-old son living with his father, and an eighteen-year-old son. (*Id.*) A mental status examination showed normal speech; anxious mood; significantly less dysphoric but still anxious affect; goal-directed and coherent thought process; no auditory, visual, or olfactory hallucinations; emphatic denial of suicidal or homicidal ideations, plans, or intent; a strong contract for safety; fair judgment; limited insight; and no cognitive deficit. (*Id.*) Plaintiff was compliant with and reported that she was doing well on her combination of medications,

---

[3] A GAF score of 61-70 indicated, "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV*, *supra* at 34.

Trileptal and Zoloft, but inquired about increasing the dose of Trileptal. (*Id.*) Dr. Lathia said that Plaintiff "was initially diagnosed with major depression, recurrent, but it is obvious that she has bipolar disorder." (*Id.*) Plaintiff was assessed with a GAF score of 45.[4] (*Id.*) Dr. Lathia increased Plaintiff's dose of Trileptal and also started her on Abilify. (*Id.*) Plaintiff was not currently attending AA meetings, but was remaining sober. (*Id.*)

On September 25, 2011, Plaintiff was admitted to Bay Regional Medical Center for an alleged assault. (Tr. at 358-59.) She suffered a contusion to the head and was treated with a Toradol shot. (*Id.*)

On April 26, 2012, Plaintiff had a psychological consultative examination from Dr. Michael Brady. (Tr. at 313-18.) She reported daily panic attacks, confusion, a lifetime of depression, lack of motivation, problems getting out of bed, disorientation, problems thinking and staying focused, anger, past suicide attempts, feelings of worthlessness, social isolation, hopelessness about future, anhedonia, diminished libido, and problems sleeping. (*Id.*) She was living with a roommate at the time, she had several close friends but rarely spoke with them, and she got along "fair" with family members. (*Id.*) She had no current interests—she used to "enjoy going to movies, spending time with friends and family, roller skating, taking walks, and bicycling." (*Id.*) On a typical day she woke up at 2:00 p.m., watched television, and went to bed a 10:00 p.m. but would not fall asleep for hours. (*Id.*) She typically ate one meal a day and did her own cooking and cleaning. (*Id.*) She appeared to be "in contact with reality," she felt worthless, there was "no unusual motor activity or hyperactivity," and she "did not appear to have a tendency to minimize or exaggerate" her symptoms. (*Id.*) "Her thoughts were

---

[4] A GAF score of 41-50 indicated, "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV*, *supra* at 34.

spontaneous and well organized. There were no problems in pattern or content of speech." (*Id.*) She denied "any auditory or visual hallucinations, delusions, obsessions, persecutions, or unusual powers. She reported feelings of worthlessness and occasional suicidal thoughts." (*Id.*) She only got five to six hours of sleep per night. (*Id.*) She appeared depressed throughout the evaluation and was oriented times three. (*Id.*)

"Results of the mental status examination revealed abnormalities in abstract reasoning." (*Id.*) Dr. Brady found that Plaintiff's "ability to relate and interact with others, including coworkers and supervisors, [was] impaired," and that "[h]er depression and distress could affect her interpersonal relationships in the workplace." (*Id.*) He also opined, "[h]er ability to maintain concentration was fair" and "[h]er ability to withstand the normal stressors associated with a workplace setting [was] somewhat impaired." (*Id.*) He diagnosed her with "Major Depressive Disorder, recurrent, moderate"; and "Panic Disorder, without agoraphobia." (*Id.*) He gave her a GAF score of 55.[5] (*Id.*)

Plaintiff had a clinical assessment to create a "person-centered" treatment plan for her symptoms at Crossroads Center for Recovery on June 11, 2012. (Tr. at 319-23.) She planned on attending group therapy sessions and getting individual psychiatric services. (*Id.*) Plaintiff saw Dr. David Picone on June 27, July 25, and September 28, 2012. (Tr. at 324-35.) She attributed her symptoms to past abuse and trauma. (*Id.*) She continued to have problems with irritability, sadness, and sleep. (*Id.*) She had primarily depressive symptoms "intermingled with symptoms of manic process." (*Id.*) She did not report any obsessive, intrusive, or persistent thoughts or compulsive, ritualistic acts. Her affect was appropriate and she exhibited a

---

[5] A GAF score of 51-60 indicated "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV*, *supra* at 34.

paranoid manner. (*Id.*) She denied hallucinations and delusions; she did not report any "symptoms of psychotic process[es]." (*Id.*) She presented as "irritable, fully communicative," and relaxed. (*Id.*) Her demeanor was "glum," her thinking was logical, and her thought content was appropriate. (*Id.*) She denied suicidal and homicidal ideas and intentions. (*Id.*) Her insight into problems was fair, her social judgment was fair, there were no signs of anxiety, there was evidence of a short attention span, and no signs of withdrawal or intoxication. (*Id.*) She was diagnosed as bipolar and depressed, tried a few combinations of medications, but she ended up taking lithium. (Tr. at 325.)

Nurse Practitioner Lawrence Beek saw Plaintiff on January 31 and March 1, 2013 at Crossroads. (Tr. at 429-30.) She was having difficulty sleeping—she would wake up around 3:00 a.m. or 4:00 a.m. and not be able to fall back to sleep and she would nap throughout the day. (*Id.*) Mr. Beek counseled her that her naps were likely one of the reasons she had difficulty sleeping properly at night. (*Id.*) Upon mental examination her affect was "reactive"; her speech was "well-modulated"; and while she denied homicidal or suicidal ideations, she admitted to "intermittent fleeting suicidal ideations," but said that if they became too strong she would contact emergency services before acting on them. (*Id.*)

Mr. Beek submitted an undated Mental Impairment Questionnaire, indicating that he had "only had the opportunity to conduct medication reviews" with Plaintiff twice. (Tr. at 410-13.) For Plaintiff's signs and symptoms, Mr. Beek only indicated with a checkmark that she had sleep disturbance, mood disturbance, and emotional ability. (*Id.*) He did not check, among other things, difficulty thinking or concentrating, suicidal ideation or attempts, intrusive recollections of a traumatic experience, or hostility and irritability. (*Id.*) He indicated with a checkmark that she had "moderate" limitations in the ability to deal with ordinary work stress,

10

that she would be off task "up to 1 hour" in an eight hour work day, that she would be absent from work "about once a month," and that her impairments had lasted or were expected to last at least twelve months. (*Id.*)

Plaintiff was "not significantly limited" in her ability "to remember locations and work-like procedures," to "understand and remember [and carry out] one or two-step instructions," to "sustain an ordinary routine without supervision," to "work in coordination with or proximity to others without being distracted by them," to "make simple work-related decisions," to "interact appropriately with the general public," and "to ask simple questions or request assistance." (*Id.*) She was moderately limited in her ability to "understand and remember detailed instructions," to "maintain attention and concentration for extended periods," to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," to "accept instructions and respond appropriately to criticism from supervisors," to "get along with co-workers or peers without distracting them or exhibiting behavioral extremes," to "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness," to "respond appropriately to change in the work setting," to "be aware of normal hazards and take appropriate precautions," to "travel in unfamiliar places or use public transportation," and to "set realistic goals or make plans independently of others." (*Id.*) She was "markedly limited" in her ability "to carry out detailed instructions." (*Id.*)

2.    **Adult Function Reports**

Plaintiff completed an adult function report on February 22, 2012. (Tr. at 213-23.) On an average day she would wake up and eat, shower, watch television, read the newspaper, and try to visit people. (Tr. at 214.) However, sometimes she would not go anywhere because of her mood swings, panic attacks, or lack of sleep from nightmares. (*Id.*) She did not take care of any animals. (*Id.*) Before her condition she "used to be able to work and be[] sociable but these last several years have gotten worse where I flip out [and am] afraid to be around people, [and it is] hard for me to trust people around me." (*Id.*) She did not have problems with her personal care. (*Id.*) She needed reminders to take her medicine. (*Id.*) She prepared her own meals, but she did not make full meals because she was afraid she would burn herself because of her lack of concentration. (Tr. at 215.) She was able to clean the house, do laundry, iron, and do the dishes; however, she sometimes needed reminders from friends or family. (*Id.*) She did not do yardwork because she was afraid to "handle anything with blades." (Tr. at 216.) She rarely went outside, and never went out alone because she felt unsafe. (*Id.*)

Her hobbies included watching television, reading (although she was unable to comprehend what she read), and biking. (Tr. at 217.) She spent time with others in person or on the phone approximately one to two times a month. (*Id.*) She needed to be reminded of her doctor appointments. (*Id.*) She had problems getting along with others because she would "fight [and] argue with all my family members [and she had] resentful feelings to[ward] them about when [she] was molested [and] neglected." (Tr. at 218.) She was not as sociable as she used to be because she could not trust anyone and felt "scared and nervous around others." (*Id.*) She reported problems with her memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (*Id.*) She had a very short attention span, could follow written instructions "pretty well," although she sometimes had to read them

several times, and could not follow spoken instructions very well. (Tr. at 218-19.) She did not

handle stress well at all and she did not like changes in her routine. (Tr. at 219.)

Plaintiff's mother, Frieda A. Bacca, completed a third party adult function report on

February 28, 2012. (Tr. at 224-35.) Her daughter suffered from mood swings and panic attacks,

was unable to concentrate, and became nervous around people when she had her "outbu[r]sts."

(Tr. at 224.) She could not sleep at night because of nightmares, but she slept a lot during the

day. (Tr. at 225.) She did not provide care for anyone else or for any pets. (*Id.*) She did not

have any problems providing for her personal care. (*Id.*) She needed reminders to take her

medicine. (Tr. at 226.) She prepared very simple meals for herself. (*Id.*) She did limited

housework and no yardwork. (*Id.*) She went outside three to four times a week. (Tr. at 227.)

She did not like going out alone because she was scared of having an outburst in public. (*Id.*)

According to her mother, Plaintiff's hobbies included watching television, roller

skating, and bike riding. (Tr. at 228.) She occasionally would talk on the phone to friends and

family, but not as much as she used to. (*Id.*) She did not go outside to socialize, only to get

groceries and do laundry. (*Id.*) She had problems getting along with others because she

sometimes would have her "outbursts" around family members and friends. (Tr. at 229.) Her

mother noticed her social activities had changed since her conditions began because she had

"lost interest in a lot of things[] because of her bipolar [and] panic attacks." (*Id.*) She indicated

that her daughter had problems concentrating, understanding, following instructions, and

getting along with others. (*Id.*) She added that her daughter became upset with people, and had

severe outbursts of anger. (*Id.*) She was unable to pay attention for very long, could not follow

written instructions well because she had problems concentrating and comprehending, and

could not follow spoken instructions very well because she would get frustrated easy and have

to hear the instructions several times in order to understand them. (*Id.*) She did not handle stress well because of her outbursts. (Tr. at 230.) Changes in her routine upset her. (*Id.*)

### 3.   Administrative Hearing

#### a.   *Plaintiff's Testimony at Administrative Hearing*

At the administrative hearing on March 22, 2013, Plaintiff testified as follows. On May 31, 2008 she overdosed on pills in a suicide attempt. (Tr. at 32.) She took her medications off and on in 2008 and eventually stopped taking them in 2009. (Tr. at 34.) She had problems sleeping at night. (Tr. at 35.) She had to stop working at the end of 2011 because she was using her computer for personal use and she was having problems contacting "accounts." (*Id.*) She had not worked since. (Tr. at 36.) She did not feel that she would be able to work, probably not even part time, because she would not be able to mentally handle any job. (*Id.*) She had a problem sleeping at night and she often became tired during the day and would have to take naps or just lie down. (*Id.*)

She had bipolar disorder which caused high days and low days. (Tr. at 37.) She said on her high days she would have a lot more energy, be happier, feel better about herself, and get more things done around the house. (*Id.*) However, during the low days she would have no energy, just lay around all day, feel tired and depressed, ignore phone calls from family and friends, and just remain locked in her room. (*Id.*) She estimated she experienced "low days" three times per week. (*Id.*) She also had post-traumatic stress disorder ("PTSD"). (Tr. at 38.) She had nightmares where she would think someone was physically hurting her or molesting her. (Tr. at 39.) She also experienced flashbacks of past traumatic experiences: she had been molested as a child, her father had died of cancer in prison, and she had discovered her son

dead in his crib from SIDS. (Tr. at 39-41.) At the time of the hearing she was taking lithium three times a day. (Tr. at 41-42.)

### b.    Plaintiff's Mother's Testimony at Administrative Hearing

Plaintiff's mother also testified about her daughter at the administrative hearing. (Tr. at 48-55.) Her daughter had problems coping, concentrating, remembering things, and sleeping. (Tr. at 49-50.) She cried a lot, had bad dreams, and had problems with low self-esteem. (Tr. at 50-51.) She had been molested when she was four years old and her father died of cancer while in prison. (Tr. at 52-55.) She had attempted suicide when she was fifteen years old, and again in 2008. (Tr. at 54-55.)

### c.    Vocational Expert ("VE") Testimony at Administrative Hearing

The ALJ asked the VE to assume an individual with Plaintiff's age, education and work experience with no exertional limitations, who was "capable of unskilled tasks, not at a production rate, should work alone or in a small familiar group with occasional contact with the public." (Tr. at 66.) The VE said that the individual would not be able to perform any of Plaintiff's past work, but would be able to do other work. (*Id.*) The VE gave three examples, all at the light level of exertion: 6000 office cleaner positions in the region (reduced for occasional contact with public), 11,000 office helper positions, and 5400 production inspector positions. (Tr. at 66-67.) The VE said that the above jobs would be available to the individual with the following additional limitations: "light exertional limitation and . . . [the] need to work in [an] environment that's free from hazards such as unprotected heights, moving machinery; the individual can work alone or in a small familiar group; the individual can have contact with the public, [is] capable of simple tasks, not at a production rate." (Tr. at 67.) The individual would be able to maintain employment even if absent one day per month and off task up to ten

percent of the workday; however, being off task for fifteen percent of the workday would be work preclusive. (Tr. at 68.)

**F.      Governing Law and Analysis**

**1.      Legal Standard**

The ALJ determined that Plaintiff had the RFC

> to perform unskilled light work as defined in 20 CFR 404.1567(b) and 416.967(b). She can perform simple tasks. The claimant can work alone or in small familiar groups. She can occasionally interact with the public. She cannot perform production rate paced work. She must avoid hazards such as unprotected heights and dangerous moving machinery. The claimant will be expected to miss one day of work every month for mental health maintenance.

(Tr. at 15.) The regulations define light work as involving

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I find that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

**2.      Substantial Evidence**

In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A reviewing court must

16

consider the evidence in the record as a whole, including any evidence that might subtract from the weight of the Commissioner's factual findings. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

### a.   *Medical Source Evidence Governing Law*

17

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-03p, 2006 WL 2329939, at *2. When "acceptable medical sources" issue these opinions, the regulations deem the statements to be "medical opinions." 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. 20 C.F.R. § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of these medical opinions, including any treating source opinions that have not been given controlling weight. 20 C.F.R. § 404.1527(c). The ALJ should use the same analysis for "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. Further, an ALJ must give a treating physician's opinions regarding the nature and severity of a claimant's impairments controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *1-2; *see also Wilson*, 378 F.3d at 544. Matters that are reserved to the Commissioner are not "medical opinions" so they do not receive this deference. 20 C.F.R. § 404.1527(d)(2). Additionally, a physician's notations of a claimant's subjective complaints are the "'opposite of objective medical evidence'" and the ALJ need not give the opinions based solely on those assertions controlling weight. *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011)

(quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). The regulations also require an ALJ to provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

### b.    Analysis

Plaintiff argues that the ALJ's decision was internally inconsistent because it gave "conflicting conclusions regarding the nurse practitioner's treatment and opinion." (Doc. 13 at 10.) She complains that the ALJ "took portions of Larry Beek's findings and the Mental Impairment Questionnaire he completed and incorporated them within the RFC. Yet the ALJ's analysis of Larry Beek's opinion was also given little weight." (*Id.*) Plaintiff then argues that if Mr. Beek's opinion were "given controlling weight despite the contradictory analysis then one factor in his analysis is work-preclusive. Namely, Mr. Beek indicated that [Plaintiff] would be off task . . . up to one hour." (*Id.* (citing Tr. 411).) Plaintiff then reasoned that because one hour divided by eight hours equals twelve and a half percent, this limitation should have resulted in a disability finding in light of the VE's testimony that being off task over ten percent of the day would be work preclusive. (*Id.*) Plaintiff also complains that the ALJ erred because she is not allowed to pick and choose certain opinions of treating sources without articulating her reasons. (*Id.* at 11-12.)

Plaintiff's argument that the ALJ should have given Mr. Beek's opinion that Plaintiff would need to be off task "up to an hour" a day controlling weight fails because Mr. Beek, as a nurse practitioner, is not a treating physician. 20 C.F.R. § 404.1513(d) ("Other sources include, but are not limited to . . . nurse practitioners[.]"); SSR 06-3p, 2006 WL 2329939, at *2 ("[O]nly 'acceptable medical sources' can be considered treating sources . . . whose medical

19

opinions may be entitled to controlling weight."). In fact Mr. Beek is not an acceptable medical source at all, and therefore his statements are not medical opinions; however the ALJ *may* use them as evidence of the impairments' severity. *See* 20 C.F.R. § 404.1513(d) ("In addition to evidence from the acceptable medical sources . . . we *may* also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work." (emphasis added).) "[A]n ALJ has discretion to determine the proper weight to accord opinions from "other sources" such as nurse practitioners." *Cruse*, 502 F.3d at 540; *see also Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2009) (finding that an ALJ may discount testimony from nurse practitioners if germane reasons are provided). Further, even if the ALJ had given this opinion dispositive effect, Plaintiff's argument fails. She relies on the fact that Mr. Beek indicated that she would be off task "up to an hour" in an eight hour work day. (Doc. 13 at 11 (citing Tr. 411).) However, because Mr. Beek was filling out a form, his only other options were "never" or several options that were all over an hour. *See* (Tr. at 411). It does not follow that Mr. Beek was indicating that Plaintiff would be need to be off task for an entire hour every day.

Further, the ALJ properly determined the probative value of Mr. Beek's opinions, as an "other source" under the six-factor balancing test laid out in 20 C.F.R. § 404.1527(c). The ALJ stated that she had "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. at 15.) "[T]here is no per se rule that requires an ALJ to articulate each of the six regulatory factors listed in 20 C.F.R. § 404.1527(c)." *Schanck v. Comm'r of Soc. Sec.*, No. 12-14837, 2014 WL 1304816 at *5 (E.D. Mich. Mar. 31, 2014).

The ALJ made the following findings concerning Mr. Beek's opinions in her Step Three analysis. She gave his opinions that Plaintiff had moderate limitations in her activities of daily living and in her social functioning significant weight, despite coming from an "other source," because "even though Mr. Beek had only examined the claimant twice, he was a psychiatric nurse and had the opportunity to meet the claimant in person." (Tr. at 13-14.) The ALJ disagreed with Mr. Beek's opinion that Plaintiff had "marked limitations" in concentration, persistence, and pace and instead found only moderate limitations in this category. (*Id.*) She reasoned that, while Plaintiff had occasional panic attacks and her medications made her feel tired, "despite her limitations, the claimant is able to sustain focus and concentration long enough to permit the timely and appropriate completion of tasks that require her attention such as concentrating on television programs, remembering to pay her bills, and counting backwards by 7s from 100." (*Id.*)

The ALJ made the following findings concerning Mr. Beek's opinions in her Steps Four and Five analyses. She gave significant weight to his opinions "that the claimant could understand, remember, and carry out 1-2 step tasks," "could sustain an ordinary routine without supervision," and "would be expected to miss work about once a month." (Tr. at 17.) The ALJ noted that she could not give Mr. Beek's opinions controlling weight because he was not an acceptable medical source and also because he had only met claimant twice. (*Id.*) The ALJ gave little weight to Mr. Beek's opinion that Plaintiff "could work in coordination with and in proximity to others without distraction" because "it was not consistent with the claimant's fear of strangers and history of panic attacks." (*Id.*)

The ALJ provided good reasons for the weight she gave to all of Mr. Beek's opinions. The only opinion that she gave "little weight" to was discounted in favor of a more restrictive

RFC. She also gave good reason for discounting his opinion that Plaintiff had "marked" limitations in concentration, persistence, and pace. Therefore, substantial evidence supports the ALJs finding with respect to the weight she accorded Mr. Beek's opinions.

Plaintiff also argues that the ALJ erred because she gave Plaintiff's mother's statements significant weight, and therefore her testimony regarding the severity of Plaintiff's impairments should have led to a disability conclusion. (*Id.* at 13-15.) Plaintiff points to her mother's testimony that she was off track quite a bit, cried a lot, had problems with memory, had to sleep during the day because of nighttime nightmares, was easily confused, was unable to go outside alone, and had problems following directions and understanding. (*Id.*)

Plaintiff's mother is considered an "other source." 20 C.F.R. § 404.1513(d) ("Other sources include, but are not limited to . . . parents[.]") The ALJ expressly considered Ms. Bacca testimony as follows: she "was not surprised to hear of her daughter's suicide attempts," her daughter had "'hard times' in her life," her daughter's "mood swings and anxiety affected the claimant's ability to work," and her daughter "was able to drive and do laundry." (Tr. at 16-17.) The ALJ gave Ms. Bacca's testimony significant weight "even though [she] was not an 'acceptable medical source,'" because she "saw the claimant frequently and was in a good position to observe the claimant's residual capacity firsthand." (Tr. at 17.)

Under 20 C.F.R. § 404.1513, an ALJ "may . . . use evidence from other sources" but there is no requirement that the ALJ do anything more than consider the other source evidence. In addition, "testimony of lay witnesses, however, is entitled to perceptible weight only if it is fully supported by the reports of the treating physicians." *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004). The ALJ considered Ms. Bacca's testimony and explained the weight given her opinion, which is all the ALJ is required to do. Plaintiff states Ms. Bacca's testimony

that Plaintiff "'gets off track quite a bit and cries a lot about different things' would certainly effect [sic] her ability to work." (Doc. 13 at 14.) In her Response to Defendant's Motion to Dismiss, Plaintiff asserts, "The record is replete with work-preclusive factors by the Claimant's mother which is internally inconsistent with a[n] unfavorable [d]ecision . . . ." (Doc. 18 at 4.) Plaintiff outlines Ms. Bacca's testimony regarding Plaintiff's inability to concentrate, getting nervous around others, having outbursts, emotional problems effecting ability to sleep, her nightmares, her getting confused, problems concentrating, comprehending, and following instructions, severe outbursts of anger, short attention span, getting frustrated easily, taking a long time to understand instructions, and problems handling stress. (*Id.* at 4-5.) She concludes that Plaintiff "could not perform work on a regular and sustained basis due to difficulties concentrating, becom[ing] nervous around people, having outburst[s] around others, sleeping during the day, and ha[ving] difficulty handling stress." (*Id.* at 5.) The ALJ appropriately factored some of these limitations into the RFC. (Tr. at 15.) As to limitations not factored into the RFC, the ALJ is not required to give any perceptible weight to lay opinion testimony that does not comport with the medical evidence, especially that of treating physicians. *Simons*, 114 F. App'x at 733. Therefore, substantial evidence supports the weight the ALJ accorded Plaintiff's mother's statements.

Plaintiff also argues that Defendant presented a post-hoc argument when she argued that "the ALJ cited adequate reasons for assigning the testimony significant weight but not dispositive weight." (Doc. 18 at 6 (citing *S.E.C. v. Chenery Corp*, 332 U.S. 194, 196 (1947)).) Plaintiff's throwaway *Chenery* claim fails to persuade. (Doc. 15 at 3.) True, the government as a litigant cannot provide, and the court cannot develop or accept, after-the-fact rationalizations for the agency decision "that the agency had not relied on in its [disputed] decision . . . ."

*McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010); *see also Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (citing *Chenery* and holding, "But these are not reasons that appear in the ALJ's opinion, and thus they cannot be used here"); *Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792, at *7 (6th Cir. 1993) (unpublished decision) ("[I]n large part, an agency's decision must be affirmed on the grounds noted in the decision."). Nonetheless, the court can consider "any evidence in the record, regardless of whether it has been cited by the ALJ" or the Appeals Council. *Blackburn v. Comm'r of Soc. Sec.*, No. 4:11-cv-58, 2012 WL 6764068 at *4; *see also Heston*, 245 F.3d at 535 ("Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."). The gravamen of the analysis is whether the Defendant or the court develops new arguments, not whether they cite evidence to support the ALJ's arguments.

Plaintiff does not explain how Defendant presented new arguments that the ALJ did not consider in her decision. Rather, Plaintiff contends that Defendant's assessment that "the ALJ cited adequate reasons for assigning the testimony significant weight but not dispositive weight" amounted to a post-hoc rationalization. (Doc. 18 at 6.) Defendant is not creating new arguments for the ALJ, nor is she presenting new evidence; she is merely pointing out that the ALJ provided good reasons for her decision.

## III.   <u>CONCLUSION</u>

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *See Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

**IV.** **ORDER**

In light of the entire record in this case, the Court finds that substantial evidence

supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS**

**ORDERED** that Plaintiff's Motion (Doc. 13) is **DENIED**, that Defendant's Motion (Doc. 17)

is **GRANTED**, and that the findings of the Commissioner are **AFFIRMED**.


Date: May 28, 2015                    S/ PATRICIA T. MORRIS
                                      Patricia T. Morris
                                      United States Magistrate Judge

**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through
the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 28, 2015                    By s/Kristen Krawczyk
                                      Case Manager to Magistrate Judge Morris